# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 60

APRIL TERM, A.D. 2013

May 15, 2013

IN THE MATTER OF THE
GUARDIANSHIP OF ROBERT A.
SANDS:

ROBERT A. SANDS,

Appellant
(Ward),

v.                                                    S-12-0209

RICHARD BROWN, Guardian and
Conservator,

Appellee
(Guardian/Conservator).

*Appeal from the District Court of Laramie County*
The Honorable Michael K. Davis, Judge

*Representing Appellant:*
Mitchell E. Osborn, Cheyenne, Wyoming.

*Representing Appellee:*
No appearance.

*Before KITE, C.J., and HILL, VOIGT, BURKE, JJ., and GOLDEN, J., Retired*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**KITE, Chief Justice.**

[¶1]   The district court entered orders appointing Richard Brown as guardian and conservator for Robert A. Sands.  Mr. Sands sought to terminate the guardianship and the district court denied his petition.  Six months later, however, the district court held a review hearing and terminated the guardianship.  Mr. Brown filed a motion for attorney fees and costs and the district court reopened the guardianship for the purpose of deciding the motion.  Before the motion was heard, Mr. Sands filed a complaint alleging that Mr. Brown had breached his duties.  After a hearing, the district court entered an order ruling in favor of Mr. Brown on Mr. Sands' complaint and awarding Mr. Brown and his attorney fees and costs.  Mr. Sands appeals claiming the district court erred when it denied his petition to terminate the guardianship, reopened the guardianship for the purpose of awarding fees and costs and dismissed his complaint.  We affirm.

## ISSUES

[¶2]  We rephrase the issues Mr. Sands presents as follows:

1.      Whether the district court properly continued the guardianship and conservatorship of Mr. Sands over his objection and the objections of his family members.

2.      Whether the evidence supports the district court's holding that Mr. Brown substantially complied with the guardianship and conservatorship statutes and did not breach his fiduciary duties.[1]

3.      Whether the district court properly ruled on the matters asserted in Mr. Sands' complaint at the final hearing on Mr. Brown's petition for fees and costs.

Mr. Brown did not file a brief in this Court.

## FACTS

---

[1] In his brief, Mr. Sands states in his second issue that the district court erred when in November of 2011 it rescinded an earlier order terminating the guardianship.  He contends the rescission exposed him to additional expense beyond what Mr. Brown had already unjustifiably paid himself and his family for unnecessary improvements to his property.  Mr. Sands cites no authority and presents no argument supporting his claim that the district court erred in rescinding its earlier order.  We, therefore, decline to address the issue. *See Fix v. South Wilderness Ranch Homeowners Ass'n*, 2012 WY 96, ¶ 15, 280 P.3d 527, 531-32 (Wyo. 2012) (we do not consider issues not supported by citation to pertinent authority or cogent argument).  Instead, we address the real focus of Mr. Sands' second argument—whether the district court erred in holding that Mr. Brown substantially complied with the statutory requirements and did not violate his fiduciary duties.

1

[¶3] In July of 2010, the director of the Wyoming Guardianship Corporation[2] filed a petition for emergency appointment of a temporary guardian for Mr. Sands. She advised the district court that Mr. Sands, who was then seventy years old, suffered from dementia and other medical problems and was unable to care for himself. The district court entered an order appointing her as emergency temporary guardian and set a hearing to determine whether a guardianship was in fact needed.

[¶4] After the hearing, the district court held that a guardianship was necessary and appointed the emergency temporary guardian as permanent guardian. She declined the appointment so the district court entered an amended order appointing Mr. Brown, a long time friend of Mr. Sands, as guardian. After learning more about Mr. Sands' assets, Mr. Brown filed a motion to amend the order establishing the permanent guardianship to also appoint him as conservator for Mr. Sands. The district court entered an amended order consistent with Mr. Brown's motion.

[¶5] At about the same time, Mr. Sands filed a verified affidavit requesting termination of the guardianship. He alleged that he was in the hospital when the guardianship was ordered and had not been informed of the guardianship proceedings until after Mr. Brown's appointment. He also alleged that Mr. Brown had taken property belonging to him. Additionally, he filed a "Petition for Due Process" asserting that he was not given notice or an opportunity to respond or be heard prior to the appointment of a guardian. He asked the district court to dismiss the guardianship proceeding and require Mr. Brown to provide an accounting or, alternatively, for an evidentiary hearing to determine whether a guardianship was in fact appropriate and was being properly administered.

[¶6] Mr. Brown filed a response asserting that at the time the guardianship petition was filed Mr. Sands was in the hospital and was unable to care for himself or comprehend his situation. Mr. Brown stated that Mr. Sands was personally served with the guardianship petition with the assistance of a hospital social worker. Mr. Brown requested the guardianship and conservatorship be left in place until six months had expired. The district court set an evidentiary hearing to determine whether the guardianship should be terminated.

[¶7] After a day and a half of testimony, the district court entered an order finding that Mr. Sands was unable to care for himself or his property without assistance and the guardianship and conservatorship should continue. The court also found, however, that Mr. Sands should be given the opportunity to regain autonomy to the extent possible.

---

[2] According to the Wyoming Guardianship Corporation (WGC) website, WGC is a 501(c)(3) organization that has been active since June 1997. It is governed by a board of directors and provides staff to serve as guardians, conservators or substitute decision makers for incapacitated persons when no other appropriate person is willing or able to serve.

2

To that end, the court reduced Mr. Brown's role to that of standby guardian, meaning that while his court appointed powers would remain in place he would not be actively involved with Mr. Sands unless necessary to protect him or his property and only after consultation with Mr. Sands' support team. If Mr. Sands proved able to make safe and appropriate decisions for himself, the district court ordered the guardianship would automatically expire in one year.

[¶8] Five months later, Mr. Sands filed a motion requesting a review hearing and an order terminating the guardianship and conservatorship. The district court held a hearing and entered an order finding there was no longer a need for the guardianship or conservatorship, terminating them and directing Mr. Brown to make a final accounting within thirty days. Mr. Brown complied and after reviewing his submission the district court discharged him from his duties. Mr. Brown then filed a motion for fees and costs. The district court determined, however, pursuant to Wyo. Stat. Ann. § 3-3-1003 and § 3-3-1103 (LexisNexis 2011)[3] that the guardianship and conservatorship should not have been terminated before an accounting and determination of fees and costs. The court set aside its previous order terminating Mr. Brown's appointment and scheduled a hearing for consideration of a final accounting and fees and costs.

[¶9] Prior to the hearing, Mr. Sands filed his complaint against Mr. Brown pursuant to § 3-1-111 (LexisNexis 2011).[4] He alleged that property belonging to him had gone missing

---

[3] **§ 3-3-1003. Court costs of conservatorship.**

The ward or his estate shall be charged with the court costs of a conservatorship for a ward, including the reasonable fees of the conservator and the attorney for the conservator.

**§ 3-3-1103. Accounting to ward; notice of hearing.**

Upon termination of a conservatorship, the conservator shall pay the costs of administration and render a full and complete accounting to the ward or his personal representative and to the court. Notice of hearing on the final report of a conservator shall be served on the ward or his personal representative unless notice is waived. Notice shall be served at the time and in the manner prescribed by the court.

[4] **§ 3-1-111. Complaint against guardian or conservator.**

(a) Any person having reason to believe that a guardian or conservator is not properly discharging his duties shall report the allegations and relevant supporting facts in a verified writing to the clerk of the district court that established the guardianship or conservatorship.
(b) The clerk shall immediately send a copy of the complaint report to the guardian or conservator in the manner provided for service of process under Rule 4(l)(2) of the Wyoming Rules of Civil Procedure.
(c) The guardian or conservator shall have twenty (20) days in which to respond to the complaint report.
(d) Upon receipt of the guardian's or conservator's response, or at the expiration of the twenty (20) day response time, whichever occurs earlier, the court shall either dismiss the complaint or set the

3

since Mr. Brown's appointment. He attached a five and a half page list of items that he claimed were missing.

[¶10] The district court convened a hearing for consideration of the final accounting, conservator/guardian's fees, attorney fees and Mr. Sands' complaint. Mr. Brown, Mr. Sands and their attorneys were present. The district court heard testimony and received evidence and subsequently entered an order. The district court found that Mr. Brown had substantially complied with the spirit and intent of the inventory, accounting and reporting requirements and had not violated his fiduciary duties. The district court awarded Mr. Brown conservator/guardian fees and attorney fees in the amounts requested, $5,340.00 and $7,426.50 respectively. The court also ordered Mr. Brown to make Mr. Sands' piano (the one piece of property the court determined was still in Mr. Brown's possession) available to Mr. Sands for pick up at a specified time. Mr. Sands filed a notice of appeal to this Court.

## STANDARD OF REVIEW

[¶11] In reviewing Mr. Sands' claim that the district court erred in continuing the guardianship, we presume the district court's findings of fact are correct and will not set them aside unless they are inconsistent with the evidence, clearly erroneous or contrary to the great weight of the evidence. *DJM v. DM (In re SRB-M),* 2009 WY 22, ¶ 8, 201 P.3d 1115, 1117 (Wyo. 2009). The same standard applies to Mr. Sands' claim that the district court's finding that Mr. Brown did not violate his fiduciary duties was clearly erroneous.

[¶12] Addressing Mr. Sands' final claim that the district court acted improperly in dismissing his complaint after a hearing that he contends was convened for the purpose of deciding only Mr. Brown's motion for fees, we conclude the claim is waived. While the question of waiver is often one of fact, when the facts and circumstances relating to the subject are admitted or clearly established, waiver becomes a question of law which we consider *de novo*. *Verheydt v. Verheydt*, 2013 WY 25, ¶ 21, 295 P.3d 1245, 1250 (Wyo. 2013).

## DISCUSSION

matter for hearing. The court may dismiss the complaint if the complaint report and response show there is no basis for the allegations that the guardian or conservator is not properly discharging his duties.

(e) Notice of the hearing shall be sent to the complainant, the guardian or conservator and, when ordered by the court, the ward.

(f) At the conclusion of the hearing, or after determining there is no basis for the allegations and no need for a hearing, the court shall issue findings and enter an appropriate order.

(g) The court may, within its discretion, assess court costs and impose attorneys fees against any party in an action instituted under this section.

4

### 1. *Order Continuing Guardianship*

[¶13]  The district court entered the order establishing the guardianship in July of 2010. Four months later, in November, Mr. Sands filed an affidavit seeking termination of the guardianship on the grounds that he had not been served with the guardianship documents and the guardian was appointed without his knowledge; he had the financial means to pay for a guardian ad litem and an attorney and wanted to confront the evidence; and the guardian had taken assets belonging to him, including cash, real property, vehicles, guns, and diamonds.  In January of 2011, the district court heard the testimony of witnesses over the course of three afternoons and ruled from the bench that the guardianship and conservatorship should continue, although with less direct contact between Mr. Sands and Mr. Brown.

[¶14]  Mr. Sands contends the district court findings were clearly erroneous.  He concedes that he was having health problems in July and August of 2010 when the guardianship was set up but claims his condition had greatly improved by the time of the January 2011 hearing, making continuation of the guardianship unnecessary.  He asserts that rather than showing the guardianship should continue, the evidence presented at the hearing showed it was causing great concern and anxiety for him.  He contends the district court's finding that it should continue was not only clearly erroneous but cruel.

[¶15]  The guardianship statutes provide in pertinent part as follows:

### § 3-2-101. Petition for appointment of guardian.

(a) Any person may file with the clerk a petition for the appointment of a guardian.  The petition shall state:

(i) The name, age and address of the proposed ward;

(ii) The status of the proposed ward as a minor, an incompetent person or a mentally incompetent person and the reasons for the petition;

(iii) The name and address of the proposed guardian, and his qualification as a fit and proper person to serve as guardian;

(iv) The residence of the proposed ward in the county or his presence in the county;

(v) The facts to show that the best interest of the proposed ward requires the appointment of a guardian in this state;

(vi) The name and address of the person or facility having the care, custody or control of the proposed ward; and

(vii) The interests of the petitioner.

**§ 3-2-104. Appointment of guardian.**

(a) The court may appoint a guardian if the allegations of the petition as to the status of the proposed ward and the necessity for the appointment of a guardian are proved by a preponderance of the evidence.

(b) The order appointing a guardian shall state the findings of the court, including:

(i) The reasons why the ward is in need of a guardian;

(ii) The appointment of the guardian;

(iii) The duration of the appointment for a specified term or permanent, subject to W.S. 3-3-1101;

(iv) The limited or plenary duties of the guardian.

[¶16] The conservatorship statutes provide in relevant part as follows:

**§ 3-3-101. Petition for involuntary appointment of conservator.**

(a) Any person may file with the clerk a petition for the involuntary appointment of a conservator. The petition appointment shall state:

(i) The name, age and address of the proposed ward;

(ii) The status of the proposed ward as a minor, incompetent person or a mentally incompetent person and the reasons for the petition;

(iii) The name and address of the proposed conservator, and his qualification to serve as conservator;

(iv) The name and address of the person or institution having the care, custody or control of the proposed ward;

(v) The fact that the residence of the proposed ward is in the county, or is a nonresident, or that his residence is unknown;

(vi) The fact that the best interest of the proposed ward requires the appointment of a conservator in Wyoming;

(vii) The estimated current value of the real estate, the estimated value of the personal property and the estimated gross annual income of the estate;

(viii) Any money payable or to become payable to the proposed ward from any source; and

6

(x) The interests of the petitioner.

## § 3-3-104. Appointment of conservator.

(a)     The court may appoint a conservator if the allegations of the petition as to the status of the proposed ward and the necessity for the appointment of a conservator are proved by a preponderance of the evidence.

(b)     The order appointing a conservator shall state the findings of the court, including:

(i)  Reasons why the ward is in need of a conservator;

(ii)  Appointment of the conservator;

(iii) The duration of the appointment for a specified term or permanent, subject to W.S. 3-3-1101;

(iv) The limited or plenary duties of the conservator.

[¶17]  After hearing the evidence, the district court found that Mr. Sands "was living under horrifying conditions in a house filled with hoarded articles and trash." His home had been without running water since 2006 and had no toilet or shower facilities. The kitchen was piled with trash and debris, making it unusable; Mr. Sands cooked on the front porch. The heating system did not work so Mr. Sands heated the home with space heaters. The electrical system was defective and dangerous. Mr. Sands had eighty loaded firearms, including semi-automatic weapons, some with rounds in the chamber, scattered around the house among the trash and other items. His bed was piled with debris, leaving only a small corner for him to sleep on. Although he owned a number of vehicles, his daily transportation was a moving van that was filled with trash and debris. He stopped paying for garbage collection because he thought the $15 per month charge was too expensive, but continued to pay $200 per month for a telephone at a business that had not operated since 2006. He chose to shut off the water in his home rather than pay to have a sewer leak fixed. The sewer leak contaminated debris in the basement and was never cleaned up. Like the home, a warehouse and airplane hangar Mr. Sands rented, as well as recreational vehicles and trucks parked on his property, were filled with hoarded articles and trash. He had fifty-seven scavenged computer hard drives in his house. Police reports indicated Mr. Sands had threatened Mr. Brown and others and had been banned from a bank because of his behavior. Mr. Sands had not filed a tax return since 2003. After Mr. Sands transferred $91,000 in investment funds from one account to another, the IRS treated it as income and seized the entire amount. Mr. Sands contacted an accountant; however, he did nothing further to remedy the alleged error. One physician testified Mr. Sands suffered from dementia. Another testified Mr. Sands suffered from Asperger's syndrome which is a form of autism.

7

[¶18] From the evidence presented, the district court concluded Mr. Sands was unable to properly manage and care for himself and his property as a result of mental illness or deficiency and a guardian was necessary both at the time Mr. Brown was appointed and at the time of the hearing in January 2011. Having reviewed the hearing transcript and the evidence, including a video tape showing the condition of Mr. Sands' home, we do not find the district court's findings or conclusions to be clearly erroneous. To the contrary, they are well supported by the evidence presented.

[¶19] In addition to the district court's findings, evidence showed that Mr. Sands was admitted to the hospital in July of 2010 for a possible overdose of medications. A psychiatrist, Dr. Tom Kirk, was asked to examine him because of concerns by other medical professionals about his decision making capacity. Based upon his evaluation, Dr. Kirk recommended that if Mr. Sands wished to be released from the hospital, there needed to be someone to keep an eye on him and the Wyoming Department of Family Services Adult Protection should be involved. Dr. Kirk also recommended the appointment of a power of attorney or someone to oversee Mr. Sands' decision making.

[¶20] Dr. Kirk testified that he saw Mr. Sands again in November of 2010 in the emergency room where he had been placed on a mental health hold after being detained by police for making threats against others. Dr. Kirk examined Mr. Sands and concluded he was a potential danger to others. Mr. Sands was diagnosed with a form of dementia that significantly impairs his cognitive functioning and decision making ability. Dr. Kirk testified that he would not have released Mr. Sands from the hospital had the guardianship not been in place. He also testified that in his opinion Mr. Sands needed a guardian's assistance with major decision making and that would not change because his condition would not improve.

[¶21] Mr. Brown testified that the house was crammed with garbage and debris. The front door would not open all the way and it was difficult to walk through the rooms they were so filled with stuff. There was a path leading to the bedroom which was covered with orange juice cartons two feet deep, causing Mr. Brown's head to hit the ceiling as he made his way. The bathroom and kitchen were unusable because they were crammed with debris and did not have running water. Mr. Sands had painted the windows shut so no air could get into the house. Extension cords ran all through the house over and under the debris.

[¶22] After obtaining a bid of $10,000 to have the house cleaned out Mr. Brown paid himself and his sons $7,000 from Mr. Sands' funds to clean it themselves. Mr. Brown testified that it took seven weeks to clean the house and they filled three 30-yard dumpsters with trash and one and a half 15-yard dumpsters with electronic equipment. It took two and a half hours to unload all of the guns they found in the home.

8

[¶23] After the house was cleaned, Mr. Brown spent $13,000 restoring the home to a habitable condition. Mr. Sands had done his own electrical work and Mr. Brown could not find an electrician willing to work on the home without first bringing it up to code. In addition to having the electrical system restored to a safe condition, Mr. Brown had the water and gas turned back on. He also had the house painted inside and out, the floors redone and the windows fixed so they could be opened.

[¶24] While the cleaning and restoration were being done, Mr. Brown arranged for Mr. Sands to live temporarily at Cheyenne Health Care and then at Pointe Frontier. The goal was to have him living in his home again by January 1, 2011. Mr. Sands moved back home on December 31, 2010.

[¶25] In addition to his testimony concerning the condition of Mr. Sands' home, Mr. Brown's testimony supported the district court's findings about Mr. Sands' financial decision making. At the same time he quit paying the $15 per month charge for garbage collection and allowed the water to be shut off rather than pay to have the sewer leak fixed, Mr. Sands continued to pay $200 per month for telephone service at a business that was no longer operating and did not actively address the alleged IRS error in seizing $91,850 from his investment account. There is simply no question the evidence presented at the January 2011 hearing supported the district court's findings and decision to leave the guardianship in place.

### 2. Compliance with Statutory Requirements and Fiduciary Duties

[¶26] Although stated differently, the real focus of Mr. Sands' argument in his second issue is on Mr. Brown and the actions he took or failed to take while serving as guardian. Mr. Sands contends, for example, that Mr. Brown failed to file the statutorily required inventory of his property, paid family members thousands of dollars to clean up his home and spent Mr. Sands' money for unnecessary improvements to the home.

[¶27] At the final hearing in this matter, Mr. Sands called Mr. Brown as a witness. Mr. Brown was questioned extensively by Mr. Sands' counsel and on cross-examination by his own counsel. After hearing his testimony, the district court stated:

> This Guardianship/Conservatorship involved a shocking case of hoarding. Mr. Sands had managed to create a completely unsanitary, unhealthy environment in which no human being could be expected to live.

[¶28] The district court summarized the evidence showing the condition of Mr. Sands' home and continued:

And into that environment Mr. Brown undertook a task no one would want. It was a nightmare in terms of the property that had to be rehabilitated. And I appreciate that now there are family members here, and they've been helping Mr. Sands; but at the time nobody was there. . . . There was just one fellow who was willing to step up and try to do something, and that was Mr. Brown.

[¶29] The court then found:

- under "filthy, disgusting" conditions, Mr. Brown proceeded to try to make Mr. Sands' desire to stay in his home possible;

- Mr. Sands was unable to understand that maintaining property required spending money;

- Mr. Brown presented evidence that his family performed the work necessary to clean up the house at a price below what other contractors would have charged and Mr. Sands had not met his burden of proving otherwise;

- although the initial inventory required by statute was not filed, through the course of the reporting process Mr. Brown provided the court with "extremely detailed" reports identifying the property that had value which substantially complied with the statute;

- any financial harm Mr. Sands suffered as a result of the guardianship/conservatorship proceedings was due to his "inability to make a cost benefit analysis and the fact that he has enough money to hire attorneys to engage in legal proceedings which can in no way be in his best interest."

[¶30] Based upon all of the evidence presented over the course of these proceedings, the district court held that Mr. Brown substantially complied with the statutes and did not violate his fiduciary duties. Having carefully reviewed the record in its entirely, we conclude the district court's findings are fully consistent with the evidence and are not clearly erroneous or contrary to the great weight of the evidence.

### 3. *Ruling on Mr. Sands' Complaint*

[¶31] In his final issue, Mr. Sands asserts the district court erred when it ruled on the issues alleged in his complaint at the final hearing when the only issue scheduled for

consideration was Mr. Brown's motion for fees and costs. At the commencement of the hearing, the following exchange occurred:

THE COURT: . . . [W]e're here for a number of motions mostly related to closing . . . the Guardianship . . . Conservatorship, and complaint that was filed . . . I guess I'm at a loss as to who should begin under the circumstances. Do you have a suggestion?

[MR. SANDS' COUNSEL]: I was wondering that. I think they should. The basis is . . . that they've . . . filed their motion for fees. We objected to those fees, and that's why we're here.

THE COURT: I agree. Is there a challenge to the accounting?

[MR. SANDS' COUNSEL]: There is a challenge to the accounting. There is a challenge to the fees. . . . I filed a request for this Court to just essentially go through the file and avoid the time and expense of having to be here today. That was in my request, for the Court to determine fees and costs and to finally terminate the Guardianship . . . without a hearing.

Essentially, Your Honor, we've stated in our objection why we object. We put forth evidence within that motion there was being checks and so forth written by the Guardian . . . .

The essence is that we have basically been deprived of the ability to do the check and balance because there was never the check, the check being the beginning inventory. That was never done. . . . [Mr. Brown's counsel] . . . said that preparation of the written inventory was impossible.

Well, it's required by statute. And unless the Court says it's impossible, it's not impossible. . . . we're kind of behind the eight ball when we say we contest the accounting. We have filed a complaint of missing property in the estate. It's hard to verify, . . . because there was never any inventory saying this is what is here to begin with. So that's another reason why we asked the Court to determine fees and costs without the time and expense of all of us being here today.

THE COURT: I don't know how that would work procedurally if there are fact issues. I think we have to have a hearing, unless you just want to waive it and have me, you know, decide it like that. If everybody stipulates to that, I could do so. But it doesn't seem fair to Mr. Brown. He ought

11

to be able to present some evidence. He has been accused of some things, and he should have a chance to respond.

. . . .

[MR. BROWN'S COUNSEL]: Your Honor, I just would like to get clarification. When [Mr. Sands' counsel] and I spoke on Friday, I was told that the only issue for today's hearing, according to Mr. Sands, would have been the . . . Guardian/Conservator fees and the attorney's fees. I understood from that conversation that it was no issue with the accounting that was being pursued; and even though there was a complaint against Mr. Brown filed on April 13th regarding missing property, I understood as well that that was not being pursued today.

So I guess I just want to be very clear about what the expectation is as to the evidence to be presented today.

THE COURT: Yeah. I'm a little confused.

[MR. SANDS' COUNSEL]: . . . . The fact is, this hearing is set to determine whether or not the Court approves or disapproves of the asserted fees and costs by Mr. Brown and [his counsel]. That's it.

And then once the Court makes the determination whether or not those fees and costs are approved, we are hoping that this estate, Guardianship/Conservatorship is closed; and then everything is behind us.

THE COURT: But the basis you claim for me not awarding those fees is that there was some misconduct on Mr. Brown's part. So it seems like somebody has to address that. If that's where you are – you're contesting the fees, and you're basing it on some kind of misconduct – maybe you ought to have to go first to prove that misconduct.

[MR. SANDS' COUNSEL]: I would be glad to go first.

[¶32] Mr. Sands' counsel proceeded to make an opening statement in which he indicated he would present evidence showing that Mr. Brown did not properly administer the estate and should not be awarded fees. He then called Mr. Brown as a witness and questioned him extensively about his actions and inactions while serving as Mr. Sands' guardian. He also called Mr. Sands' nephew who testified that he came to Cheyenne while Mr. Brown was working on Mr. Sands' house and Mr. Brown told him he was moving everything out of the house to get it ready to sell. Mr. Sands' counsel stated he had no further witnesses.

[¶33] At that point, the district court stated:

12

> Very well. I'm going to enter judgment on partial findings in this case, now that you've been completely heard, [counsel], on behalf of Mr. Sands. I don't think it's necessary to receive any evidence from the Guardian, given the nature of the case and what I've seen so far.

The district court summarized its reasoning and held that Mr. Brown substantially complied with the statutes and did not violate his fiduciary duties.

[¶34] We have said:

> Waiver occurs when there is an intentional relinquishment of a known right manifested in an unequivocal manner. *Cathcart v. Meyer*, 2004 WY 49, ¶ 21, 88 P.3d 1050, 1060 (Wyo. 2004); *Jensen v. Fremont Motor Cody. Inc.*, 2002 WY 173, ¶ 16, 58 P.3d 322, 327 (Wyo. 2002). While the intent to waive may be implied from conduct, the conduct should speak the intent clearly. *Id.* Silence or delay in asserting a right without more does not constitute the unequivocal manifestation of intent required for a claim of waiver. *Jensen*, ¶ 20, 58 P.3d at 327-28. To support a claim of waiver there must be an obligation to speak or the silence or inaction must be of such duration that is shows an intent to yield a known right. *Id.*

*Verheydt*, ¶ 24, 295 P.3d at 1251.

[¶35] At no time during the hearing did Mr. Sands' counsel object to the proceedings. To the contrary, he voluntarily participated in the proceedings when, in response to the court's statement that somebody had to address the misconduct issue and maybe it should be the party alleging it, counsel stated he "would be glad to go first" and proceeded to make an opening statement and call and examine witnesses to testify in an effort to prove Mr. Brown's misconduct. Even when the district court stated that it intended to enter judgment and informed counsel that he had been "completely heard," no objection was made. Likewise, when the district court made its ruling, counsel did not object. We hold that any claim of error in the proceedings was waived by counsel's unequivocal manifestation of intent to participate and failure to object.

[¶36] Affirmed.

13